```
                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MICHIGAN
                      SOUTHERN DIVISION


_____


UNITED STATES OF AMERICA,

            Plaintiff,

      v.                                File No. 1:13-CR-109

AHMED SHERIF GREEN,

            Defendant.
_____/


                        Sentencing

Before

            THE HONORABLE ROBERT HOLMES BELL
                United States District Judge
                    January 16, 2014



                       APPEARANCES



MARK V. COURTADE                   JOHN M. KARAFA
Assistant U.S. Attorney            1440 Peck St.
P.O. Box 208                       P.O. Box 27
Grand Rapids, MI 49501             Muskegon, MI 49443
Attorney for Plaintiff             Attorney for Defendant







Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
```

1                                    Grand Rapids, Michigan

2                                    January 16, 2014

3                                    9:05 a.m.

4                          -    -    -

5

6                    P R O C E E D I N G S

7

8        THE COURT:  You may be seated.  Good morning.

9        The first matter of the morning is the matter of

10   United States v. Ahmed Sherif Green.  This is the Court's file

11   number 13-CR-109, Mr. Courtade representing the United States

12   Attorney's Office, Mr. Karafa by court appointment

13   representing Mr. Green.

14        Mr. Green was here before this Court on September

15   6th and entered guilty pleas to Count 1, conspiracy to

16   distribute one kilogram or more of a mixture containing a

17   detectable amount of heroin; Count 3, possession with intent

18   to distribute a hundred grams or more of a mixture or

19   substance containing an amount of heroin; and Counts 4 and 5,

20   possession -- felon in possession of firearm, being namely two

21   firearms.  A plea agreement was tendered at the time the plea

22   was taken and that plea agreement obviously has been accepted,

23   the Court finding that the charges adequately reflect, and the

24   plea entered, the total offense behavior in this matter.

25        A presentence report was prepared by Ms. Mosley in

1   this matter.  Counsel have had an opportunity to review the

2   same.  It is some 21 pages in length.  Are there any

3   objections, additions or corrections at this time, Mr.

4   Courtade?

5           MR. COURTADE:  No, Your Honor, but I do want to

6   clarify something in case it wasn't clear, and that has to do

7   with Paragraphs 23, 24, and 25 of the report.  In there the

8   probation agent indicates Mr. Wells, the Detroit drug dealer,

9   was arrested through the cooperation of a confidential

10   source.  The Court should be aware that that confidential

11   source was in fact defendant Ahmed Green.  So I don't know

12   that we need to amend the report, just so the Court is aware

13   that what happened was Ahmed was arrested, he cooperated, the

14   source was arrested, and then as the Court's well aware, Ahmed

15   Green went back to selling heroin and that resulted in him

16   being charged with everything.

17           THE COURT:  When you got the presentence report, why

18   didn't you ask her to correct that?

19           MR. COURTADE:  Because it was clear to me and I

20   quickly read it and I thought to myself, Well, that's

21   accurate.  But then as I sat there reading it last night, I

22   thought, Well, I wonder if the Court is aware that that

23   confidential source, by saying it that way, we were actually

24   referring to Ahmed Green.

25           THE COURT:  Usually not.

1          MR. COURTADE:  So I wanted to let you know that at

2  this point.

3          THE COURT:  Okay.  Okay.  And I presume you're

4  amening what he just said?

5          MR. KARAFA:  That's correct, Your Honor.

6          THE COURT:  Okay.  Anything else?

7          MR. COURTADE:  No, Your Honor.

8          THE COURT:  Okay.  You may proceed with your

9  objections.

10          MR. KARAFA:  Your Honor, thank you.

11          Your Honor, I consulted with my client with regard

12  to the Presentence Investigation Report.  We had a few

13  corrections and some objections, most of which were resolved

14  through meetings with the probation officer.  We have one

15  remaining objection to Paragraph 46 of the Presentence

16  Investigation Report proposing an enhancement on a proposition

17  that Mr. Green was an organizer, leader, manager or supervisor

18  for a two-level enhancement.

19          THE COURT:  It really wasn't proposed.  It was put

20  in the presentence report, wasn't it?

21          MR. KARAFA:  Pardon me?

22          THE COURT:  It wasn't proposed.  It was put in this

23  report.

24          MR. KARAFA:  Yes.  Well, we respectfully disagree

25  with the probation officer's interpretation of the guideline

on these facts set forth in the presentence report. And we presented -- I have presented my written objection and the basis for it and the guidelines computations as they come out should the two-level enhancement be sustained or our objection be sustained, and it's essentially a two-point swing under the guidelines.

THE COURT: You just said based on statements Ms. Toliver made to law enforcement officers. I haven't seen the statements. I'm not aware of them. Do you have them?

MR. KARAFA: Well, they're referenced -- the presentence report in Paragraph 46 makes reference to Ms. Toliver's residence at 505 Lydia and her operation of the stash house at that location.

THE COURT: Then your real objection is that looking at the presentence report on its bare face does not evidence the management of this Ms. Toliver.

MR. KARAFA: Yes.

THE COURT: That's your real argument?

MR. KARAFA: That's correct, Your Honor.

THE COURT: Okay. Anything else on that?

MR. KARAFA: Nothing further on that point, Your Honor.

THE COURT: Okay. Response?

MR. COURTADE: Your Honor, I would clarify something defense counsel said. While there is a two-point adjustment

1    in the guideline when computed without the career offender

2    application, there's really only a one-point overall

3    difference we're talking about.  It would reduce the

4    defendant's total offense level from 35 to 34.  It's not two

5    points, and the reason for that is the application of the

6    career offender guideline.

7    Now, as to the substance of his objection, whether

8    or not the government can show that the defendant managed this

9    other woman, these are the facts as I understand them.  The

10    defendant was arrested and he said, I keep all my drugs at a

11    house I own on Lydia Street.  There's a woman living there.

12    She watches my drugs and sells some of the heroin.

13    The police went and talked to the woman.  She said,

14    Yes, he stores his drugs here and I sell some of the heroin.

15    The defendant says his position is, Well, she's not selling

16    the heroin for me.  She's buying it from me and selling it on

17    her own.  So do I want the heroin sold?  Yes, because I'm

18    selling to her, but I'm not controlling her.  The only thing

19    she's doing is living in the house to maintain it looking like

20    a house and I store my drugs there.  Does that fit the

21    technical definition of supervision?  I guess the answer is it

22    could, but it's like a weak case.  I don't advocate for that

23    finding, although the Court certainly could sustain the

24    finding.

25    And the reason we don't have more information is

because the police were not investigating or they ceased their
investigation of Paris -- of Ahmed Green at that time.  They
were more interested in his cooperation, so they never
followed up on that whole angle of was he controlling this
woman.  In fact, they were going to let him go scot-free and
not face any charges at all.  So they ceased their
investigation, and only when months later he was selling
heroin again did they say, We're going to throw the book at
you, or rather did I say, We're going to throw the book at
you.

THE COURT:  Well, let's cut to the chase here.
You're not objecting, then?

MR. COURTADE:  I'm not objecting, Your Honor.  It
would be a one-point difference, though, not a two-point
difference.

THE COURT:  Tell me why it would be a one-point.

MR. COURTADE:  As the probation officer correctly
points out in her response to the objection, the defendant's
guidelines based on the quantity and everything that he did
were so high that they were actually higher than his guideline
level would have been with the career offender enhancement.
So therefore, you go with the highest possible manner, and it
was one point higher than the career offender guideline.

If you subtract two points from that application of
guidelines, it puts him one point lower than the career

offender guideline, in which case the career offender
guideline says career offender still counts, and therefore, he
would be a level 34, not a level 33, and the probation agent
correctly points that out.  The ultimate computation would
result in a guideline range, 34-VI, 262 to 327 months, and she
is absolutely correct in that.

        THE COURT:  So Paragraph 48 is what?

        MR. COURTADE:  Let me go back to 48.  Paragraph 48
would drop to 36, Your Honor, which you would then subtract
three points from and you would end up at 33.  But the
defendant's criminal history as a career offender says you
start out at a 37, subtract three, you are at a 34.
Therefore, 34 is the final guideline range, not 33, because
the career offender guideline is higher now.

        THE COURT:  So you and Mr. Karafa are of the
position that the answer to Paragraph 48 is a 34-point total
with a criminal history level VI.  Is that where your position
is?

        MR. KARAFA:  That's correct, Your Honor.  Our
position --

        THE COURT:  This is crazy, gentlemen.  This is
crazy.  We've got some students watching this too.  This is
crazy.

        MR. COURTADE:  Your Honor, 48, the answer is 36.
But then you have to go to 49, and 49 says career offender

says he's a 37. So he's a 37, and then you minus your three for acceptance, he's a 34 overall, and that's what you end up with at 52. So the answer to 52 is 34.

THE COURT: Thirty-four. All right. Are we agreed, Mr. Karafa? Any further objections?

MR. KARAFA: Yes, that the career offender takes the highest between the career offender guideline and the otherwise applicable guideline, and we propose that the higher guideline by our interpretation is the career offender guideline, 37 minus three, 34, and category VI. That's correct, Your Honor.

THE COURT: Anything else you wish to place before the Court in this matter?

MR. KARAFA: No, thank you, Your Honor.

THE COURT: Okay. I have the guideline then at a 34 and seven (sic) at 262-327. Is that right?

MR. COURTADE: That's correct, Your Honor.

MR. KARAFA: Yes, Your Honor.

THE COURT: Very well. You have, I believe, a motion for a variance. Do you wish to take that up with your allocution?

MR. KARAFA: Yes, Your Honor.

THE COURT: Very well. You and your client may come to the podium.

MR. KARAFA: Your Honor, thank you. May it please

1    the Court.  We have submitted our sentencing memorandum and

2    attached exhibits from a number of family members and

3    neighbors regarding Mr. Green.  Mr. Green stands humbly before

4    the Court for numerous reasons, one of which is his past

5    record which he has acknowledged.

6            I would emphasize, as I have done somewhat briefly

7    in my written presentation to the Court, that as Mr. Green

8    appears, he's a fairly large man, six-six and nearly 400

9    pounds.  The constant thread throughout his history, it

10   appears through the presentence report prepared by Ms. Mosley

11   and certainly throughout the letters that have been submitted

12   to this Court, are that one theme is that Mr. Green has

13   historically been a nonviolent, peaceful man, and he's been

14   compliant throughout his jail term of 239 days up to this

15   point in time for which we'd certainly request that he receive

16   credit.

17           He's a bit of an enigma to the extent that this is

18   not a gentleman who appears before this honorable Court at age

19   41 with a history of drug convictions in his past that has

20   been a participant or addicted to the drugs.  He has been

21   apparently throughout the course of his adult life free of

22   those kinds of addictions, whether it's alcohol or other

23   substances.

24           The theme that comes across through many of the

25   letters that have been presented to the Court is that he's a

fairly lovable person within his family.  He has spent a
considerable amount of time in prison.  When he's been out of
prison he has apparently been one to counsel others, his
nieces and nephews, and even a neighbor, a young man, to do
well in school, to help your mother around the house, and to
pursue responsible objectives.  I think Mr. Green has
throughout his life not practiced what he has preached, and in
talking with him I would submit that perhaps he has not
perceived that those things that he's preached to other
people, to young people in his family, many of whom are here
today, that Mr. Green does not perceive that those things,
those productive goals that he's preached to others are an
option for him throughout his life.

He obviously comes from a very dysfunctional
background when he was young.  His father was absent.  His
mother was addicted herself.  He went through -- dropped out
of the eleventh grade, and he spent considerable time in
prison from that point forward in the state prison system.

He's had two children more recently.  They're very
young, five months old and two years old now.  His fiancee is
in court today.  They have a five-month-old child, and between
his age of 41 years and the fact that he's now a father, he
has a new perspective on life or at least he's pursuing a new
perspective.  He is admittedly one who has been driven by
materialistic things in the past, making a buck in a way that

he thought was his only option. That was misguided and he
recognizes that now.

He's pursued a spiritual approach while in jail.
He's done now what he has not done much in the past. He's
pursued a course of reading, spiritual guidance. We've
attached the certificates that demonstrate that Mr. Green has
been pursuing a deeper spirituality than he has practiced in
the past, and he has the support of his family members who are
here.

He faces obviously a minimum mandatory 15 years in
prison with guidelines that have him at the advisory range of
21.8 to 27 years, so he recognizes that at age 41 he's facing
a great deal of the rest of his life in prison. But he does
seem to have nonetheless a sense of optimism about getting out
as soon as he can and proving that the rest of his life will
be responsible and productive, re-establishing his family
relationships, and he requests the Court's consideration of
some reasonable adjustment below the advisory guidelines for
those reasons.

THE COURT: Thank you. Thank you.

Mr. Green, is there anything you would wish to say?

DEFENDANT GREEN: Yes, sir. I have -- I had wrote
you a letter, a seven-page letter that obviously didn't get
here. But I want to say that I knew selling heroin and crack,
marijuana, what it do to people. When I first started selling

drugs at 17 I never thought about what it did to people.  At
40 when I was selling drugs I didn't -- I knew what it did,
but I didn't care.  I don't do drugs, period, and I don't
condone 'em for young people.  I never sold drugs to a young
person in my life.

I did 17 years in prison.  Every time I got out, I
got a job.  I'd lose the job some kind of way, get laid off or
whatever.  Only thing I ever knew since I was 17 was attempt
to sell drugs, and I sold drugs.  I can say I'm proud of
myself I never used drugs; I never smoked cigarettes; I don't
have tattoos, earrings; never been in a gang.  I finally had a
child when I was like 40, 39.  Best thing that ever happened
to me.  Now I got two sons.  They won't be here.  You will
never see them.  Nobody -- they won't.

Your Honor, I never had nothing to stand on ever.  I
never had something to stand on.  I had family, but I grew up
in prison.  They don't know how to help me.  I don't know how
to go to them for help.  I was looking all the wrong places.

Paris Wells, good, dear friend.  I feel bad.  I wish
I could do his time.  This evidence that they got, he probably
get a lot of time that he shouldn't get 'cause the way how
they -- how this all happened, it was crazy, but it was three
people.  I set up over seven to ten people.  The only reason
that I started selling back drugs again was because I had to
try to treat these people -- like I told them, my house got

vandalized, our cars got vandalized. I had to try to make this -- I called, the police came. They called the feds and told them what happened 'cause I told them that I was working for the feds.

People I'm trying to portray and I told the feds I'm trying to portray that I'm not working with you all because you all will get me killed. They was like -- they tried to put me in protective custody. I'm already a scum for setting up people. I can't leave my family -- I couldn't leave my family out there, so I talked to the feds. I called them every day, this and that. I don't know what to do. They said, Don't worry about it. They had me still setting people up doing ten people. I had -- they was gonna let me go, so they say. I don't really believe it because they -- every time I try to hurry and get it over with, they wouldn't let me.

THE COURT: So you're kind of a victim of the police?

DEFENDANT GREEN: No, I'm not. I'm not a victim.

THE COURT: That's what you're saying.

DEFENDANT GREEN: I'm a victim. I did it to myself. I victimized my family.

But I just want to say one thing. I want to apologize to my fiancee and my nephew, people from Grand Rapids. These children, please don't -- leave drugs alone.

1  It's not worth it.

2      THE COURT:  Excuse me.

3      DEFENDANT GREEN:  It's not worth it.  I want to --

4  every person, I could just tell them one thing.  If you can't

5  go to nobody else, you just got to call God.  That's the

6  only -- Jesus is the only way I can stand up here without

7  passing out.

8      I never had just the foundation that I believe that

9  I have now.  I'm gonna stick to it.  It don't matter how much

10 time I get.  I'm not gonna run away from it.  That's what I'm

11 leaning on.  I never leaned on it before.  I tried everything

12 else.  This is the only thing I ain't tried, Your Honor.

13     I want to one day, one day walk out of prison, tell

14 my sons all about this, tell them about my experiences, try to

15 stop other kids and other people from having to deal with this

16 because it's only two things you gonna get, this and death.

17 And I was fortunate enough, blessed by God to be alive to

18 hopefully stop one person, show them my record, like, Man,

19 look at this.  You can't do it.  You got to try -- you got to

20 try something else.  I didn't have nobody to do that for me

21 and I'm gonna do it for somebody else no matter how much time

22 I get.

23     But I pray that you just try to find in your heart

24 to at least give me a chance before I die to be able to see my

25 sons.  And with that I'll close, Your Honor.

1          THE COURT:  Have you had a chance to read the

2     presentence report in this matter?

3          DEFENDANT GREEN:  Yes, sir.

4          THE COURT:  Does that represence report

5     accurately describe you and your history?

6          DEFENDANT GREEN:  Yes, sir.

7          THE COURT:  Are you satisfied with Mr. Karafa's

8     representations of you in this matter?

9          DEFENDANT GREEN:  I'm over-satisfied.  I'm satisfied

10    with Mr. Courtade with his help too.  But if it weren't for

11    him, I'd still be -- I wouldn't -- I wouldn't be able to stand

12    up.  He led me to Forgotten Man Ministries.

13         THE COURT:  Mr. Green, it becomes my responsibility,

14    obviously, to sentence you, as I've done for thousands of

15    people.

16         DEFENDANT GREEN:  Yes, sir.

17         THE COURT:  I've looked this matter over, and a

18    couple matters trouble me before I get to the sentence.  One

19    is remarks that were made by various people about you I find

20    rather interesting.  One of them says that you obeyed your

21    grandmother's rules she set out for you, and it goes so far as

22    to say your trouble really started when you lost your

23    grandmother a few years ago.  She was the only one who kept

24    you in line.  You didn't say that.  Somebody else said that

25    about you.

And not only do they all say that you had respect for people and that you helped other people and you were a genuinely sweet person, this sort of matter, but what troubles me somehow is that -- I'd like to think of a polite way to tell you man-to-man, but I can't think of a polite way to tell you.  In many ways you're still a boy.  You're still a boy.  Now, I listened to you.  You listen to me now.

DEFENDANT GREEN:  Okay, yes, 'cause I agree.

THE COURT:  You're still a boy.  And men don't do things like this.  Men don't do this kind of activities.  Men stand up.  They don't call themselves a victim.  They get up in the morning and they go to work and they work hard and they pay taxes, and those taxes are what have helped pay the prisons to keep you and ultimately reimburse your attorney for the representations he's given you.  So never mind what we're talking about here for just a moment.  You have not carried your full weight of responsibility for society, and you know that.

DEFENDANT GREEN:  Yes.

THE COURT:  And it's not laid back on your grandmother.  It's not laid back on your mother or a father that you never knew.  A lot of us lost fathers when we were little.  A lot of us had to buck up our chins and take off and we had to work.  Some of us worked on assembly lines.  Some of us worked painting houses.  Some of us worked hard to get

1  where we are now, but we worked.

2  DEFENDANT GREEN:  Yes, sir.

3  THE COURT:  And that's what made men out of us.  I

4  don't see a work history from you that I could look back to

5  and say, Well, you know, you know, I really think, Mr. Green,

6  that you worked well with General Motors there for ten years.

7  What happened?  No.

8  The other thing that concerns me is you got easy

9  money, never paid any taxes on it, and you got into selling

10 drugs, which ultimately ruins people.

11 DEFENDANT GREEN:  Yes.

12 THE COURT:  Your sale of those drugs was a direct

13 link to the ruination of other people.  And when you ruined

14 other people, if they were adults, what do you think those

15 adults' children felt like as a result of your selling drugs?

16 So there's a chain that takes place when you do this kind of

17 activity.

18 What bothers me is you came in at 17 in Montgomery

19 County in Dayton, Ohio, and you were sentenced for aggravating

20 drug trafficking at 17 years of age and you got an 18- to

21 60-month sentence in 1991.  You were out rather quickly

22 because, and maybe it's contemporaneous with this, you were

23 sentenced in Detroit for possession with intent to deliver

24 under 50 grams of cocaine in 1992 three to 20 years when you

25 were 19.

1      Then we had a break here for a little while.  You
2  had a false information to a police officer that you paid a
3  $250 fine for here in Grand Rapids in 1992.  But in '04 you
4  got a state court conviction here in Grand Rapids for
5  delivering less than 50 grams of cocaine and you got 15 months
6  to 18 years in prison.

7      So you've had a series of not long sentences, but
8  each one should have gotten your attention.  And the question
9  I have is why didn't it get your attention?  If you touch a
10 hot stove and you get burned, are you going to touch it
11 again?  No.

12      DEFENDANT GREEN:  No, sir.

13      THE COURT:  If you touch it three times, is there a
14 good chance that the fourth time you're going to get burned?

15      DEFENDANT GREEN:  Right.

16      THE COURT:  Okay.  Where does the analogy fall out
17 with you and drug convictions and drugs?

18      DEFENDANT GREEN:  That's a question for me?

19      THE COURT:  That's question for you.

20      DEFENDANT GREEN:  Yeah, 'cause you told me -- well,
21 you are -- you are right, sir.

22      THE COURT:  I hope I am, but I need your answer to
23 that question.

24      DEFENDANT GREEN:  My answer to that question is when
25 I first started, when I first did it, I came back, I -- those

years, I was in prison for that long stint.  I never really --
I got out for a few months and I was still in prison.  I did
17 years in prison, and yes, it burned every time.

You said I didn't have a work history, Your Honor,
but every time that I got out, I got a job.  I worked until I
got laid off due to whatever, due to things just like
everybody else in society.  I worked.  I never stopped
trying.  I was working at the time when they said this
conspiracy had started.  I was working then.  I got laid off.
I still was trying to find a job, still trying to find jobs.
I paid taxes too, Your Honor.  I have, not many.  I didn't
have no long work history because I done 17 years.  I've been
out less than five years of my life since 17.

THE COURT:  Well, do you realize what percentage of
the population -- let's take percentage of men.

DEFENDANT GREEN:  Right.

THE COURT:  What percentage of men in America have
had three drug convictions?  Less than one percent, probably
1/50th of one percent.  Why do you happen to fall in that
category?

DEFENDANT GREEN:  Because I didn't grow up.  I
didn't -- Your Honor, all those times, I'm telling you, I'm
giving you the honest-to-God truth, I had nothing to stand on,
Your Honor.  I didn't have nothing to stand on.  I thought
that I was smarter than everybody else and I wasn't.  I didn't

1    have what I got now.  I believe that if I get out now, if I
2    ever get a chance to get out, I just pray that I don't die in
3    prison, that I will stand on God.  I will trust in God to
4    guide me to do whatever I got to do.
5            When I was out, not only was I working in 2012, but
6    I was volunteering for 61st District Court and Habitat for
7    Humanity 40 hours a week without no applause, pats on the
8    back.  I did it 'cause I was hoping that I could get a job out
9    of it after that and they ran out of funds, so they had to let
10   us go.
11           THE COURT:  So that's why you're here?
12           DEFENDANT GREEN:  I'm here because I'm stupid, man.
13   I keep making -- I keep doing the same thing expecting
14   something different to happen.  That's why I'm here.
15           THE COURT:  Doesn't happen, does it?
16           DEFENDANT GREEN:  I know.  I know it don't.
17           THE COURT:  And everyone told you it wouldn't
18   happen, didn't they?
19           DEFENDANT GREEN:  Yes, everybody.
20           THE COURT:  Okay.  Thank you.
21           With this history of drug convictions, the nature
22   and circumstances of this offense, and as I said, the history
23   and characteristics that come through in this matter, I find
24   this is a serious offense, and I really find a lack of respect
25   for law.  Clear lack of respect for law.  I don't know quite

1   how to address it in this case, but it's clearly here.

2   　　　　When we got up against a wall, we got up against

3   some hard times, then we reverted to what would put cash in

4   our pockets regardless of how it was done, except that no one

5   was hurt directly.  A lot of people were hurt indirectly.  A

6   lot of people were hurt with the cocaine that we have here and

7   the heroin that we've had in the past history and the heroin

8   we have here.  Heroin is deadly.

9   　　　　And felon in possession, now, I know you're going to

10  say you had to have a gun to protect yourself, but you knew

11  you weren't supposed to have a gun.  You knew you weren't to

12  be within a hundred feet of any gun.  You knew that.

13  　　　　DEFENDANT GREEN:  Yes, sir.

14  　　　　THE COURT:  And you got a gun.  And they weren't

15  squirrel guns either.  They weren't pheasant-hunting guns

16  either.  They were guns that could be used for offense.

17  　　　　In order to afford an adequate deterrence and

18  protect the public and provide some educational and

19  correctional treatment, the sentence of this Court will be

20  that of 300 months or 25 years in the custody of the Federal

21  Bureau of Prisons.  I want you to receive education and I want

22  you to receive vocational opportunity.  I think you should be

23  able to learn to read, learn to make good decisions, educate

24  yourself.  Look for those around you who can help educate

25  you.  We all do.  We all should be doing that.  Look for

people that are wiser than we are.  Look for people we can
model ourselves after.

You say, Well, where can I in the prison?  There are
people there.  There are people there.  Look for good
correction officers.  There are good correction officers
there.  There are good chaplains there.  You should be able to
re-educate yourself, and I say re-educate yourself and emerge
from this experience considerably more mature and wiser.
You'll be a better husband, you'll be a better father, you'll
be a better grandfather, and you'll be a better citizen of
this country.

Yesterday I spoke to about 35 new citizens coming
from all over the world, and what struck me particularly about
the people coming from Sudan and some of these countries that
have had terrible, terrible problems is they all but kissed
the ground when they became citizens.  They appreciated what
they had here in America, and they over and over again told me
that afterwards as they were taking pictures and I was shaking
their hands.  I think you have a lot to be thankful for.

DEFENDANT GREEN:  I do.

THE COURT:  You're going into this, but you have an
awful lot to be thankful for.  You have a family that stuck
with you through thick and thin, and very few families will do
what your family has done for you, and for that you better be
very appreciative of them.

1          Those five years of supervised release following

2   your incarceration, I want cognitive behavioral therapy to

3   address some of the questions that present themselves in this

4   matter with criminogenic needs being first and foremost.

5   Potential mental health component, but I don't think we're

6   going to need that.  I want you to be nowhere near anyone

7   using or possessing illegal drugs.  I want you -- I don't want

8   you near anybody who has a felony record unless your

9   supervised release officer says so.

10          Now, where could you go that you could find nice

11  people who would not have, presumably, drugs on them and would

12  not have felony records?  Where could you go?

13          DEFENDANT GREEN:  Probably to a church.

14          THE COURT:  Yeah, that's right.  Good idea.  Good

15  idea.

16          I want you to maintain full-time employment.  Now,

17  you say it's hard.  It's hard.  Not if while you're in here

18  you learn a trade.  You can learn a skill or a trade.  You

19  seem to be smart.  And therefore, there are electronics

20  courses, there are even some skilled labor like bricklaying,

21  those kind of trades, that you should be able to learn so that

22  when you come out, you will be sought after for the skills

23  that you have.  Not necessarily for the strong back you have

24  because the strong back you have is not going to last forever,

25  but the skills you have in your brain will last.  So I want

1  you to do that.

2        And I want you to obviously report monthly to the

3  supervised release officer, keeping the officer informed of

4  your address and telephone number at all times.  I want you as

5  well to do something by way of community service.  I'm going

6  to require initially that five hours a week be spent in

7  community service.

8        Find someone that you can look to as a mentor.

9  You'll find them.  Ask people where you can find a mentor and

10 find a mentor, hopefully someone a little older than you

11 that's traveled down the road, law-abiding road, that you can

12 come to and you can ask questions of, not necessarily your

13 family.

14       A mandatory special assessment of $400 will be

15 required in this matter.

16       Do you have a motion as it pertains to Count 2 of

17 the indictment in this matter?

18       MR. COURTADE:  Yes, Your Honor.  Pursuant to plea

19 agreement we would ask that Count 2 be dismissed.

20       THE COURT:  Motion granted.  In lieu of a fine, any

21 monies earned will be remitted for purposes of caring for

22 small children.

23       Any legal objection to the sentence imposed not

24 previously raised from the government?

25       MR. COURTADE:  None, Your Honor.

1          THE COURT:  From defense?

2          MR. KARAFA:  Your Honor, thank you.  We would only

3    preserve the objection to the substantive reasonableness and

4    the denial of the motion for variance.

5          THE COURT:  Very well.  Your motion for variance of

6    course is denied.

7          You have a right of appeal of this sentence and this

8    conviction, 14 days in which to file that appeal.  Your

9    counsel will assist you if you so desire.  You'll be remanded

10   to the federal marshal for execution of this matter, of this

11   sentence.  That's all.

12         Thank you, Mr. Karafa, for your care and your

13   counsel in this matter.

14         MR. KARAFA:  Thank you, Your Honor.

15         THE COURT:  That's all.

16              (Proceedings concluded at 9:45 a.m.)

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


         I, Kevin W. Gaugier, Official Court Reporter for the
United States District Court for the Western District of
Michigan, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a true and correct transcript of the proceedings
had in the within-entitled and numbered cause on the date
hereinbefore set forth.

         I do further certify that the foregoing transcript
was prepared by me.




/s/  Kevin W. Gaugier

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
110 Michigan N.W.
622 Federal Building
Grand Rapids, MI 49503